IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| LOLITA R. MATAMMU, | ) |
| | ) |
|    Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 1:20-cv-1468 (RDA/TCB) |
| | ) |
| COUNTY OF FAIRFAX, VIRGINIA, *aka* | ) |
| *Fairfax County Health Department*, | ) |
| | ) |
|    Defendant. | ) |

## **MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Defendant Fairfax County's ("Defendant") Motion for Summary Judgment (Dkt. 34) ("Motion"). The Court dispenses with oral argument as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); E.D. Va. Loc. Civ. R. 7(J). The Motion is now ripe for disposition. Considering the Motion together with Defendant's memorandum in support of the Motion (Dkt. 35); Plaintiff Lolita Matammu's ("Plaintiff") Opposition (Dkt. 37); and Defendants' Reply (Dkt. 38), it is hereby ORDERED that Defendant's Motion for Summary Judgment is GRANTED for the reasons that follow.

### I. BACKGROUND

#### A. Factual Background

Although the parties dispute certain facts, the following material facts are either undisputed or considered in the light most favorable to Plaintiff. *See Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (noting that courts must view the evidence on summary judgment in the light most favorable to the nonmoving party); *see also* Defendant's "Material Facts Not Genuinely in Dispute" (Dkt. 35 at 2-16); Plaintiff's Responses to Defendant's Statement of "Material Facts Not Genuinely in Dispute" (Dkt. 37 at 2-8).

Plaintiff was hired as a school health aide by Fairfax County Health Department ("FCHD") on October 1, 2007. Dkt 35 ¶ 1. A health school aide is a critical position as the first line of care protecting the health and safety in children enrolled in the Fairfax County School System. As a health aide, Plaintiff was required to provide care to sick and injured students, administer medication according to FCHD guidelines, document all care provided on clinic charts, notify parents or guardians of significant events according to the guidelines, and coordinate vision and hearing screenings for her assigned school. *Id.* ¶ 2.

Plaintiff was first assigned to Chesterbrook Elementary School. *Id.* ¶ 3. During the 2015-16 school year, Plaintiff's FCHD supervisor, Averil Tomlinson, noted that Plaintiff had difficulty managing the busy health room that accommodated between 30 and 40 students each day. *Id.* ¶ 4. Tomlinson also noted that Plaintiff was not following medication administration procedures. *Id.* ¶ 5. Plaintiff was later directed to attend SHA refresher training in October of 2016. *Id.* ¶ 6. At the end of the 2015-16 school year, Plaintiff requested a transfer to Franklin Sherman Elementary School, which was a smaller school closer to her home and saw fewer students visiting the health room. *Id.* ¶ 7. Plaintiff did not submit a formal accommodation request under the Americans with Disabilities Act for this transfer. *Id.* ¶ 8.

While at Franklin Sherman Elementary for the 2016-17 school year, Plaintiff continued to experience work performance issues, which her new FCHD supervisor, Janessa Deal, noted in detailed FCHD records. *Id.* ¶¶ 9-10. On November 30, 2016, Plaintiff successfully dislodged a piece of candy from a student's throat but did not use the emergency call/panic button to summon other staff members for assistance or notify school administrators in a timely fashion. *Id.* ¶ 11. The principal of Franklin Sherman Elementary, Kathleen Quigley, highlighted to Plaintiff the importance of using the emergency button during a choking event, and in response Plaintiff stated,

"[w]hy should I call you, ma'am? This is an emergency. I don't even know what's going on." *Id.* ¶ 12; Dkt. 37 ¶ 12.

Another performance incident occurred in December of 2016. In response to a student's allergic reaction, Plaintiff prepared to administer a smaller dose of epinephrine from a junior epinephrine auto injector ("EpiPen"), even though the student's body weight would have typically required a larger dose from a regular EpiPen. Dkt. 35 ¶ 13. Before she could use the EpiPen Jr®, the physical education teacher intervened and told Plaintiff to use the standard EpiPen based on the student's weight. *Id.* Plaintiff claims that the child's mother previously told Plaintiff that she typically uses the EpiPen Jr®, so Plaintiff followed the mother's instructions. Dkt. 37 ¶ 13. After this event, Principal Quigley told Janessa Deal, Plaintiff's supervisor, that she lacked confidence in Plaintiff's ability to administer the correct EpiPen. Dkt. 35 ¶ 14. Plaintiff was aware that Principal Quigley felt dissatisfied with her performance after the incident. *Id.* ¶ 15.

Between November 29, 2016, and January 4, 2017, Plaintiff administered daily prescription medication to a student despite knowing the medicine, although the correct prescription was labeled for the student's brother. *Id.* ¶ 16. Even so, according to Plaintiff, the student's mother gave Plaintiff permission to use the incorrectly labeled bottle until she could obtain the correct bottle. Dkt. 37 ¶ 16. The school investigated Plaintiff in connection with this incident. Dkt. 35 ¶ 17. Ultimately, Plaintiff received an oral reprimand on February 27, 2017 and was placed on a performance improvement plan ("PIP") for her failure to follow medication administration procedure. *Id.* On May 9, 2017, Principal Quigley requested Plaintiff's transfer to a different school for the following school year, citing a lack of confidence in Plaintiff's abilities by teachers and staff, trust issues, and her view of Plaintiff's poor judgment. *Id.* ¶ 18. On May 10, 2017, Averil Tomlinson, Janessa Deal, and Helen Berger met with Plaintiff and informed her

3

that Principal Quigley had requested Plaintiff's transfer to a different school.  *Id.* ¶ 19.  At the meeting, Plaintiff acknowledged Principal Quigley had the right to request to transfer Plaintiff to another school and that she would never want to stay at a school if the principal did not want her to remain there.  *Id.* ¶ 20.

On May 12, 2017, Plaintiff dislodged popcorn from a student's throat.  *Id.* ¶ 21.  She did not use the emergency button to call for assistance and did not immediately notify school administrators of the incident.  *Id.*  Instead, Plaintiff informed Principal Quigley of this incident at the end of the school day; Principal Quigley, in turn, reminded Plaintiff to use the emergency button in future situations.  *Id.* ¶ 22.  Plaintiff sent a response email to Principal Quigley, which she claims she sent to show Principal Quigley how she felt about the situation.  *Id.* ¶ 24.  Plaintiff's email stated, "I wish you treated me as a subordinate not enemy, someone that you can trust not hate.  I have a month to stay in your school and I will just bear everything for the sake of my family especially my 3-year-old grandson that is defending [sic] on us for help."  *Id.* ¶ 23.  Soon thereafter, Plaintiff applied to transfer to another school.  *Id.* ¶ 20.

Defendant ultimately transferred Plaintiff to Shrevewood Elementary School, located on Shrevewood Road in Falls Church, Virginia, about a ten-minute drive from Plaintiff's home.  *Id.* ¶¶ 25-26.  Shrevewood Elementary had a large student population, numbering 770 students in 2019, and a very busy health room, with an average of 332.7 visits during 2018-19 academic year.  *Id.* ¶¶ 27-28.  When Plaintiff first started at Shrevewood Elementary for the 2017-18 school year, Plaintiff's FCHD supervisor at the time, Leah Deike, had concerns regarding Plaintiff's ability to provide care for a diabetic student.  *Id.* ¶ 29.  Specifically, Leah Deike noted that Plaintiff needed prompting to begin the routine, seemed slow and unprepared, and had to be reminded to use the flip chart to follow protocol.  *Id.*  Yina Lee replaced Leah Deike as Plaintiff's FCHD supervisor,

4

and she shared similar concerns. *Id.* ¶ 30. As a result, Yina Lee advised Plaintiff of her mistakes, including miscalculating insulin doses, making rounding errors, improperly disposing of needles, and failing to consistently follow procedure for documenting and communicating diabetic care with parents. *Id.* ¶ 31. The Shrevewood Elementary administration also raised concerns about Plaintiff's ability to operate independently to Yina Lee in November 2017. Dkt. 35-19 at 2.

On November 29, 2017, Plaintiff took Family and Medical Leave Act ("FMLA") leave after submitting multiple forms documenting her need to take leave to—among other things—assist her daughter, who had mental health issues and premature twins; to care for her husband, who had early dementia and needed help with daily living activities; and to care for her own medical conditions including uncontrolled diabetes, hypertension, hyperlipidemia, and anxiety. Dkt. 35 ¶ 33. It does not appear to be disputed that any of the requests at this time referenced a diagnosis or disability regarding Plaintiff's fingers and hands. *Id.* ¶ 34. Plaintiff returned to work in February of 2018, but she continued to make errors and not follow FCHD health and safety protocols. *Id.* ¶ 35. On February 15, 2018, when Yina Lee attempted to address these errors with Plaintiff, Plaintiff threatened Lee by stating her husband had killed people and that when people disrespect her, she "will get back at them." *Id.* However, Plaintiff does not recall making these statements to Yina Lee and stated that if she had made such comments, she was likely joking. Dkt. 37 ¶ 35.

Yina Lee continued to work with Plaintiff regarding her issues with care for diabetic students. Dkt. 35 ¶ 36. After not adhering to diabetic action plans and protocols, Plaintiff was placed on a PIP on February 28, 2018. *Id.* ¶ 37. However, Plaintiff continued to make mistakes after being placed on the PIP, including on April 13, 2018, when Plaintiff administered 6 units of insulin to a student when only 5.5 units were needed. *Id.* ¶ 38. Additionally, Plaintiff received numerous complaints about her performance from the administrators, staff, parents, and students

of Shrevewood Elementary. *Id.* ¶ 39. Plaintiff's response to this feedback was generally unprofessional, loud, angry, inappropriate, and disrespectful. *Id.* ¶ 40. For example, after Plaintiff left a child unattended in the health room with a high fever for over an hour, she received a complaint from the child's parent. *Id.* ¶ 41. Plaintiff responded, "I don't know why she hates me, maybe I look like her ex or something." *Id.* Plaintiff claims this response was a joke, but Principal Michelle Eugene and Assistant Principal Tylea Holley thought this response was unprofessional and bordered on insubordination. *Id.* ¶ 42.

On October 25, 2018, Yina Lee met with Principal Eugene and Assistant Principal Holley to discuss their concerns regarding health room issues, such as the need for Plaintiff to improve her tone, volume, and verbiage when responding to feedback. *Id.* ¶ 43. Principal Eugene also expressed her concerns to Plaintiff directly, though Plaintiff did not agree with Principal Eugene's feedback and did not change her behavior. *Id.* ¶ 44.

On March 18, 2019, Plaintiff received another parent complaint. *Id.* ¶ 45. A student Plaintiff treated sat in the health room with a nosebleed for about 45 minutes. *Id.* Instead of first calling the student's father, who was five minutes away from the school, Plaintiff called 911. *Id.* The child's parent complained to Principal Eugene about Plaintiff's handling of the situation. *Id.* Yina Lee investigated this complaint and questioned Plaintiff and Noela Abanto, who was covering the health room on March 18, 2019, while Plaintiff took her lunch break. *Id.* ¶ 46.

Over the next two days, Principal Eugene spoke with Yina Lee regarding the complaints about Plaintiff, the number of health room issues the school was experiencing, questioned whether Plaintiff could handle the busy room, and said that Plaintiff needed to work on her response to feedback. *Id.* ¶¶ 48-49. Principal Eugene further expressed that she could not "continue to get complaints" about Plaintiff. *Id.* ¶ 49.

6

But the complaints continued. On March 26, 2019, another parent complained about Plaintiff's work performance, which apparently involved her "handling of an arm injury" and a student's lost inhaler. *Id.* ¶ 50. After receiving this complaint, Yina Lee met with Helen Berger from FCHD and Principal Eugene to discuss Plaintiff's work performance. *Id.* ¶ 51. During the meeting, Principal Eugene requested that Plaintiff be transferred out of Shrevewood Elementary. *Id.* Helen Berger informed Plaintiff of this request on April 10, 2019, and told Plaintiff that she would be transferred to a different school immediately. *Id.* ¶ 53. In response, Plaintiff requested leave to get her blood sugar levels under control. *Id.* Principal Eugene documented her request to have Plaintiff immediately transferred on April 12, 2019, citing Plaintiff's defensiveness, inability to communicate effectively, and inability to manage the number of health room visits or ask for help. *Id.* ¶ 52.

On April 22, 2019, Plaintiff met with Helen Berger and Brian Hochstrasser. *Id.* ¶ 54. They informed Plaintiff in writing of Principal Eugene's request to FCHD that Plaintiff be transferred. *Id.* They also notified Plaintiff that she would be transferred to Armstrong Elementary School. *Id.* The official notice stated that FCHD had reviewed and granted Principal Eugene's request to transfer Plaintiff. *See* Dkt. 35-33 at 1. When asked in her deposition if she understood that FCHD "had to" initiate the transfer upon Principal Eugene's request, Plaintiff responded "[Principal Eugene] has a right to say that." Dkt. 35-2 at 268-69. Plaintiff contends that her transfer to Armstrong Elementary was punishment for calling 911 for the student suffering from a nosebleed. Dkt. 35 ¶ 56.

Armstrong Elementary is located at 11900 Lake Newport Road in Reston, Virginia, which is a 20-minute drive from Plaintiff's home. *Id.* ¶ 58. In 2019, 403 students were enrolled at Armstrong Elementary, and during the 2018-19 school year there were about 140.2 visits to the

7

health room—less than half of the number of student visits to the Shrevewood Elementary health room for the same year. *Id.* ¶ 59.  At the time of Principal Eugene's request, Armstrong Elementary was the only school with a school health aide vacancy to which Plaintiff could be transferred. *Id.* ¶ 57.  Plaintiff had never been to Armstrong Elementary, was unaware of the exact address of the school, and did not know how long it would take her to travel from her home to the school. *Id.* ¶ 60.

On April 25, 2019, Plaintiff submitted a FMLA leave form completed by her doctor, Dr. Shore Armani, requesting twelve months' leave to address her medical conditions, including uncontrolled diabetes, gout, and severe hand deformities. *Id.* ¶¶ 67-68.  Additionally, Plaintiff did not accept her assignment at Armstrong Elementary and requested in writing in a letter dated April 26, 2019, again in an email on June 3, 2019, and again in a letter from her attorney dated August 19, 2019, an assignment closer to her home because of her need to care for her disabled daughter and autistic grandson, for whom she is the primary caretaker. *Id.* ¶¶ 60-61, 66.  The letter from Plaintiff's attorney, Roy Tesler, was sent to Dr. Gloria Addo-Ayensu, Director of FCHD. *Id.* ¶ 61. Plaintiff did not mention complications with her hands in the aforementioned letters, but in the FMLA leave request form from April 25, 2019, Plaintiff's doctor lists limited hand movement as a result of her severe hand deformities.  Dkt. 35-44 at 2; Dkt. 35 ¶ 67-68; Dkt. 35 ¶ 62.[1]  Plaintiff further attests that she told Helen Berger and Brian Hochstrasser that it is difficult for her to drive and hold a pen in the wintertime and that her hand is immobile after she writes thirty or more charts, which makes it difficult to safely drive a long-distance home from work. *Id.* ¶¶ 63-64.

---

[1] Plaintiff claims she showed Helen Berger and Brian Hochstrasser her hands and told them that "during cold weather it greatly pains me to drive long distances."  Dkt. 35 ¶ 62.

Plaintiff exhausted her FMLA leave on September 17, 2019, though FCHD gave her an additional four weeks of non-FMLA leave in hopes that Plaintiff would be able to return to work. *Id.* ¶¶ 69-70.  Pamela Crum-Davis, Human Resources Manager for FCHD, called Plaintiff on September 26, 2019 to advise her that she would need to return to work, cautioning that if Plaintiff did not report by October 18, 2019, Plaintiff would be considered to have voluntarily resigned. *Id.* ¶ 71.  Crum-Davis sent a follow-up email after this phone call summarizing the conversation, to which Plaintiff responded, "I fully understand what you are telling me." *Id.* ¶ 72.  In this response, Plaintiff did not provide further details about the voluntary resignation, request an accommodation, or mention a disability.  *Id.*  After Plaintiff did not report to Armstrong Elementary on October 18, 2019, the FCHD treated Plaintiff's failure to report to be a voluntary resignation. *Id.* ¶ 73.

The decisions to extend Plaintiff's leave and consider Plaintiff's failure to report to work as a voluntary resignation were primarily made by Pamela Crum-Davis, Joanna Hemmat, and Shauna Severo; the decisions were approved by Dr. Addo-Ayensu. *Id.* ¶ 74.  Helen Berger and Brian Hochstrasser were not involved in the decision to consider Plaintiff's failure to report as a voluntary resignation.  *Id.*  Brian Hochstrasser provided a timeline of Plaintiff's performance to Joanna Hemmat and Pamela Crum-Davis on July 22, 2019 and advised that Plaintiff "should not continue to work in her present position as a sole care provider for children in the schools."  Dkt. 37 ¶ 74.  However, Hochstrasser did not mention a disability or accommodation request in the email from July 22, 2019.  Dkt. 37-5.  Therefore, other than their knowledge of the details mentioned in the FMLA leave request written by Dr. Armani, these decisionmakers—Pamela Crum-Davis, Joanna Hemmat, Shauna Severo, and Dr. Addo-Ayensu—remained generally unaware of Plaintiff's difficulty with driving, requested accommodation, or hand condition. Dkt. 35 ¶ 75; Dkt. 37 ¶ 75.

B. Procedural Background

On November 30, 2020, Plaintiff filed suit in this Court. Dkt. 1. She submitted an Amended Complaint as of right on February 2, 2021, alleging three claims for violations of the Americans with Disabilities Act ("ADA") and one claim for a violation of the Age Discrimination in Employment Act ("ADEA"). On September 30, 2021, this Court granted in part and denied in part Defendant's Motion to Dismiss. *See* Dkt. 18. The Court denied the motion as to Plaintiff's failure-to-accommodate and retaliation claims under the ADA but granted the motion as to the ADA wrongful discharge claim and the ADEA claim. *See id.* at 11. The Court granted Plaintiff leave to amend her Amended Complaint as to those claims, which were dismissed without prejudice, *id.*, but she elected not to do so. *See* Dkt. 22 at 2.

II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, "[s]ummary judgment is appropriate only if the record shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Hantz v. Prospect Mortg., LLC*, 11 F. Supp. 3d 612, 615 (E.D. Va. 2014) (quoting Fed. R. Civ. P. 56(a)). "A disputed fact presents a genuine issue 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Id.* at 615-16 (quoting *Spriggs v. Diamond Auto. Glass*, 242 F.3d 179, 183 (4th Cir. 2001)). The moving party bears the "initial burden to show the absence of a material fact." *Sutherland v. SOS Intern., Ltd.*, 541 F. Supp. 2d 787, 789 (E.D. Va. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists." *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

On summary judgment, a court reviews the evidence and draws all reasonable inferences

in the light most favorable to the non-moving party. *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 570 (4th Cir. 2015) (quoting *Tolan*, 572 U.S. at 657); *McMahan v. Adept Process Servs., Inc.*, 786 F. Supp. 2d 1128, 1134-35 (E.D. Va. 2011) (citing *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)). This is a "fundamental principle" that guides a court as it determines whether a genuine dispute of material fact within the meaning of Rule 56 exists. *Jacobs*, 780 F.3d at 570. "[A]t the summary judgment stage[,] the [Court's] function is not [it]self to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

A factual dispute alone is not enough to preclude summary judgment. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48. A "material fact" is one that might affect the outcome of a party's case. *Id.* at 248; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). The substantive law determines whether a fact is considered "material," and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *Hooven-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001). A "genuine" issue concerning a "material fact" arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the non-moving party's favor. *Anderson*, 477 U.S. at 248.

Rule 56(e) requires the non-moving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324. "An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant

11

or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). And this Court requires that the non-moving party list "all material facts as to which it is contended that there exists a genuine issue necessary to be litigated and citing the parts of the record relied on to support the facts alleged to be in dispute." E.D. Va. Loc. Civ. R. 56(B).

### III. ANALYSIS

As a threshold matter, many of the facts Plaintiff disputes are immaterial to the resolution of her remaining claims. In addition, other material facts Plaintiff attempts to place in dispute are not actually disputed because Plaintiff merely objects to a characterization of a fact, an inference drawn from the fact, or speculation not grounded in the summary judgment record. Other purported disputes amount to little more than argument by counsel. These are not viable methods of disputing a material fact on summary judgment. *See Celotex Corp.*, 477 U.S. at 324; *Rountree v. Fairfax Cty. Sch. Bd.*, 933 F.2d 219, 223 (4th Cir. 1991). Therefore, the Court treats these facts as undisputed. *See* Fed. R. Civ. P. 56(e)(2) (permitting the court to consider improperly supported or inadequately addressed facts as undisputed for the purpose of summary judgment).

### A. ADA Failure-to-Accommodate Claim (Count I)

Plaintiff's first claim alleges Defendant failed to accommodate her disability in violation of the ADA. To maintain a claim under the ADA for failure to provide a reasonable accommodation, a plaintiff must prove as part of her *prima facie* case that "(1) she qualifies as an 'individual with a disability' as defined in [the statute]; (2) the County had notice of her disability; (3) she could perform the essential functions of her job with a reasonable accommodation; and (4) the County refused to make any reasonable accommodation." *Reyazuddin v. Montgomery Cty.*,

789 F.3d 407, 414 (4th Cir. 2015) (citing *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013)).[2]

Although applicable to other theories of relief under the ADA, "[t]he *McDonnell Douglas* test is inapposite in a failure-to-accommodate case because a failure-to-accommodate case does not require proof of the employer's motives." *Perdue v. Sanofi-Aventis U.S., LLC*, 999 F.3d 954, 959 n.2 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 767 (2022) (quoting *Punt v. Kelly Servs.*, 862 F.3d 1040, 1049 (10th Cir. 2017)). If a plaintiff makes a *prima facie* showing, her employer may defeat the failure-to-accommodate claim by "demonstrating that the reasonable accommodations would impose an undue hardship." *Perdue*, 999 F.3d at 959.

1. Qualified Individual with a Disability

"In order to count as a 'qualified individual' entitled to the ADA's protections, a person must be able 'with or without reasonable accommodation [to] perform the essential functions of the employment position that such individual holds or desires.'" *Elledge v. Lowe's Home Ctrs., LLC*, 979 F.3d 1004, 1009 (4th Cir. 2020) (quoting 42 U.S.C. § 12111(8)). "Stated another way, a qualified individual is one who is 'able to meet all of a program's requirements in spite of'" her disability. *Pooler v. Supervalu, Inc.*, No. 3:03-cv-275, 2004 WL 3335385, at *6 (E.D. Va. July 23, 2004) (quoting *Southeastern Cmty. Coll. v. Davis*, 442 U.S. 397, 406 (1979)).

The record shows that Plaintiff began an extended absence from work due to her need for a twelve-month continuous period of incapacitation. Dkt. 35 ¶¶ 67-68. Plaintiff's inability to report to work underscores the reality that she was simply not "able to meet all of [her position's] requirements in spite of [her] handicap." *Tyndall*, 31 F.3d at 213. Plaintiff has not introduced any

---

[2] Defendant does not contest the second or third elements, and the Court finds that these elements of Plaintiff's failure-to-accommodate claim are satisfied for purposes of judgment.

13

competent evidence that would demonstrate she was a "qualified individual" protected by the ADA at the time of her termination. 42 U.S.C. § 12111(8). Therefore, she fails to establish the first element of her *prima facie* claim.

### 2. Defendant's Refusal to Provide Reasonable Accommodation

The Court next turns to whether there is sufficient evidence in the record to support a finding that Defendant refused to provide Plaintiff with a reasonable accommodation. Plaintiff maintains that she sought a reasonable accommodation for her inability to commute to work on cold days due to her hand impairment. Plaintiff requested that she not be transferred to Armstrong Elementary and instead be permitted to remain in her position at Shrevewood Elementary.

Under the ADA, a defendant need not provide a perfect accommodation or the precise accommodation an employee requests. So long as the accommodation an employer offers is reasonable, there is no violation of the ADA. *See, e.g., Reyazuddin*, 789 F.3d at 415-16. An employer is also not required to create a new position for an employee with a disability, or reassign other employees in an effort to accommodate a disabled employee, to satisfy its obligations under the ADA. *See id.* (citing *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401-02 (2002)); *Perdue*, 999 F.3d at 960.

Plaintiff's argument that Defendant refused to provide her with her requested reasonable accommodation fails for three reasons. First, Defendant was under no obligation to provide Plaintiff with the exact accommodation she requested. Second, Plaintiff argues that at the time of her termination she was qualified for her position because although she was unable to perform her job at Armstrong Elementary, she could have fulfilled her job's essential functions if she had remained at Shrevewood Elementary. Yet there is insufficient medical evidence in the record to suggest that a reasonable factfinder could conclude that she could not have performed her role at

Armstrong Elementary, especially where that post would have required her to be responsible for far fewer student visits to the health room.

Finally, there is no legal authority establishing that Defendant was required to consider Plaintiff's commute time when considering her reassignment to another elementary school. Although a reassignment that detrimentally affects a plaintiff's health may be considered an adverse action, *see Jyachosky v. Winter*, 343 F. App'x 871, 877 (4th Cir. 2009) (per curiam), that proposition is distinct from the notion that an ADA failure-to-accommodate claim might *require* an employer to examine employee commute time to a particular reassignment when crafting a reasonable accommodation. An employee's rejection of an accommodation due to concerns about a longer commute time "does not render Defendant's conduct violative of the ADA or the accommodation unreasonable because the longer commute does not implicate Plaintiff's job-related needs." *Nelson-Rogers v. Kaiser Permanente*, No. GJH-17-3326, 2020 WL 917067, at *8 (D. Md. Feb. 25, 2020) (citing *Corrigan v. Perry*, 139 F.3d 888, 1998 WL 129929, at *9 (4th Cir. 1998); *Corder v. Lucent Techs. Inc.*, 162 F.3d 924, 928 (7th Cir. 1998); *Pinto v. N.Y. City Admin. for Children's Servs.*, No. 18-cv-1852, 2018 WL 4333990, at *10 (S.D.N.Y. Sept. 11, 2018)). The summary judgment record does not show that driving to work, in and of itself, was an essential function of Plaintiff's job as a school health aide.[3] Here, with Plaintiff having failed to show that the transfer to Armstrong Elementary would have implicated her job-related needs, this Court concludes that no reasonable jury could find that Defendant refused to provide Plaintiff a

---

[3] Theoretically, Plaintiff would have a more viable case if the summary judgment record established that she had no other alternatives for arranging travel to Armstrong Elementary. Plaintiff fails to explain how alternatives such as riding public transportation, carpooling, or using other ride-sharing services were unavailable to her, however, and the Court reads this silence to suggest that driving her own car was not, in fact, Plaintiff's only means of commuting to work.

reasonable accommodation—assuming that Plaintiff could, in fact, be considered a qualified individual under the ADA.

In sum, Plaintiff has both failed to establish that she was otherwise qualified under the ADA or that "any reasonable accommodation" would have "enable[d] her to perform these functions." *Tyndall*, 31 F.3d at 213. Simply put another way, the failure of Plaintiff to perform her job responsibilities, except under the terms she believes she could have performed them, does not make out an ADA claim. For these reasons, the Court grants Defendant summary judgment on Plaintiff's failure-to-accommodate claim.

## B. ADA Retaliation Claim (Count II)

Plaintiff also brings a claim for retaliation under the ADA. In cases such as this one, where the plaintiff proceeds with circumstantial rather than direct evidence, the *McDonnell Douglas* burden-shifting framework governs an ADA retaliation claim. *See Ullrich v. CEXEC, Inc.*, 709 F. App'x 750, 753 (4th Cir. 2017) (per curiam) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Under that framework, if a plaintiff establishes a *prima facie* case of retaliation, the burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory, non-retaliatory justification for taking the alleged retaliatory action at issue. *Hannah P. v. Coats*, 916 F.3d 327, 347 (4th Cir. 2019). If the defendant meets this burden, the burden then shifts back to the plaintiff, who must demonstrate that the defendant's stated reasons are pretextual. *Id.* That is, a plaintiff's retaliation claim will fail unless "she can show that she was fired under suspicious circumstances and that her employer lied about its reasons for firing her." *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015). In such cases, "the factfinder may infer that the employer's undisclosed retaliatory animus was the actual cause of her termination." *Id.* (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).

To make a *prima facie* case of retaliation under the ADA, a plaintiff must prove that: (1) she engaged in protected activity; (2) her employer took adverse action against her; and (3) the adverse action was causally connected to her protected activity. *See A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 350 (4th Cir. 2011). Defendant argues that for purposes of summary judgment Plaintiff engaged in a protected activity but contests the remaining elements of Plaintiff's *prima facie* case of retaliation. Viewing the facts in the light most favorable to Plaintiff, the non-moving party, the Court assumes for purposes of summary judgment Plaintiff engaged in protected conduct when she requested an assignment closer to her home. With this in mind, the next element Plaintiff must establish to defeat summary judgment is that her employer took adverse action against her.

With respect to whether Plaintiff suffered an adverse action, the parties dispute whether she was terminated or whether the circumstances she faced amounted to a constructive discharge. As the record reveals, Plaintiff was warned on September 26, 2019, that if she did not report to work by October 18, 2019, FCHD would consider her to have voluntarily resigned. *See* Dkt. 35. ¶ 71. Plaintiff acknowledged this forewarning in an email to HR manager Pamela Crum-Davis, stating "I fully understand what you are telling me." *Id.* ¶ 72. By October 18, 2019, Plaintiff had not reported to work. *Id.* ¶ 73. Therefore, the question before the Court is whether these conditions should be construed as a constructive discharge that might support a finding that Plaintiff suffered an adverse employment action.

The Fourth Circuit has "recognize[d] that a complete failure to accommodate, in the face of repeated requests, might suffice as evidence to show the deliberateness necessary for constructive discharge." *Johnson v. Shalala*, 991 F.2d 126, 132 (4th Cir. 1993). Furthermore, to show that Defendant forced Plaintiff's resignation such that the Court should construe it as a

constructive discharge, Plaintiff must prove: (1) that Defendant's actions were deliberate and (2) that her working conditions were intolerable. *Lacasse v. Didlake, Inc.*, 712 F. App'x 231, 239 (4th Cir. 2018) (per curiam) (citing *Heiko v. Colombo Sav. Bank, F.S.B.*, 434 F.3d 249, 262 (4th Cir. 2006)). In conducting this factual inquiry, the Court examines whether the employment environment was intolerable "from the objective perspective of a reasonable person." *Heiko*, 434 F.3d at 262 (citing *Williams v. Giant Food Inc.*, 370 F.3d 423, 434 (4th Cir. 2004)).

The summary judgment record is utterly devoid of any evidence to suggest that the working conditions could be found objectively intolerable. To start, the suggestion that Defendant deliberately attempted to force Plaintiff to resign is speculative at best. Although the Court appreciates that Plaintiff held a good-faith, subjective belief that this outcome is the one Defendant was working to achieve, the evidence points to the contrary conclusion. The undisputed summary judgment record shows that Defendant encouraged her to report to work following the exhaustion of her FMLA leave on September 17, 2019. Furthermore, Defendant extended Plaintiff an additional four weeks of non-FMLA leave in hopes that she would return to work after taking sufficient time away from work. A reasonable factfinder would not find that these efforts were those of an employer hoping to force out an employee. Additionally, the record contains no evidence of intolerable working conditions. To the contrary, the summary judgement record demonstrates that Plaintiff would have seen fewer students, and would have had to complete less writing, had she reported to work at Armstrong Elementary. The volume of students and the corresponding writing load were intertwined with her previous performance issues, and this Court is therefore hard-pressed to see how a reassignment that would have ameliorated those challenges could be objectively viewed as evidence of intolerable work conditions. In light of the undisputed facts on summary judgment, the Court concludes that Plaintiff voluntarily left her employment

and that she did not suffer an adverse action. She has therefore failed to establish a necessary element of her *prima facie* case of retaliation under the ADA.

Even if she could establish this element, however, Plaintiff's *prima facie* case also fails at the causation stage. She engaged in protected activity on April 22, 2019; even assuming her separation from employment could be understood as a constructive discharge. To be sure that event did not occur until she failed to report to work by October 18, 2019 as Crum-Davis directed. Dkt. 35 ¶ 73. The gap between Plaintiff's protected activity and the alleged adverse action is therefore nearly six months. Although temporal proximity taken alone may raise an inference of causation at the *prima facie* stage, *see Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273, (2001), "[a] six month lag is sufficient to negate any inference of causation." *Hooven-Lewis*, 249 F.3d at 278. This lag time is insufficient for Plaintiff to establish temporal proximity even if she were to prove an adverse employment action through wrongful discharge at the *prima facie* stage.

Because Plaintiff has not established a *prima facie* case of retaliation under the ADA, the burden does not shift to Defendant to articulate a non-retaliatory reason for taking the alleged adverse action at issue. If the burden did shift, however, the summary judgment record contains ample evidence that Plaintiff was separated from employment only after she failed to report to work for a continuous six-month period, not because she participated in a protected activity. Likewise, the record does not suggest that Defendant's stated reasons for taking the alleged adverse action were pretextual. Because Defendant has come forward with a legitimate, non-retaliatory reason for taking the alleged adverse action, *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 298 (4th Cir. 2004), it has rebutted any presumption of retaliation under the ADA. And because no reasonable juror could find that Defendant's true reason for separating Plaintiff from

19

employment was her decision to engage in protected activity, *see Burgess v. Bowen*, 466 F. App'x 272, 277 (4th Cir. 2012), Plaintiff has not carried her burden of persuasion.

For these reasons, the Court must grant Defendant summary judgment on Plaintiff's retaliation claim.

## IV. CONCLUSION

For these reasons, it is hereby ORDERED that Defendant's Motion for Summary Judgment (Dkt. 34) is GRANTED.

The Clerk is directed to enter judgment for Defendant pursuant to Federal Rule of Civil Procedure 58, vacate the pretrial hearing and trial date from the Court's docket, and close this civil action.

It is SO ORDERED.

Alexandria, Virginia
July 19, 2022

/s/
Rossie D. Alston, Jr.
United States District Judge